**AFFIDAVIT OF SPECIAL AGENT AMY MOUSSEAU IN SUPPORT OF VERIFIED COMPLAINTS FOR FORFEITURE IN REM**

I, Amy Mousseau, being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am and have since December 2015 been a Special Agent with the Defense Criminal Investigative Service ("DCIS").  I am currently assigned to the DCIS Boston Resident Agency in Boston, Massachusetts.  From January 2003 to December 2015, I was a Special Agent with the Naval Criminal Investigative Service ("NCIS").  From July 2001 to January 2003, I was a uniformed police officer for the United States Capitol Police ("USCP").  During the course of my career, I have participated in the execution of numerous search warrants, arrests, and criminal investigations of individuals and organizations for violations of federal laws.  I have received specialized training on how to conduct investigations involving Health Care Fraud, Mail Fraud, and Identity Theft.

2.      I am responsible for investigating and enforcing violations of Title 18 United States Code, Section 1349 (Conspiracy to Commit Mail Fraud, Health Care Fraud and Securities Fraud), 1341 (Mail Fraud), 1347 (Health Care Fraud), 2 (Aiding and Abetting), and 1028(a) (Aggravated Identity Theft), as they related to the Department of Defense.  As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.  I am also an "investigative or law enforcement officer" of the United States, that is, an officer of the United States who is empowered by the law to conduct

investigations of and to make arrests for the offenses enumerated in Title 18 and Title 21 United States Code.

3.      *LUCSOK In Rem Action.*  I make this affidavit in support of a verified complaint for forfeiture in rem for the following financial accounts (collectively the "LUCSOK SUBJECT FUNDS") and vehicles (collectively, the "LUCSOK SUBJECT VEHICLES"):

a.  all funds in **Lucsok Target Account #1**, the Navy Federal Credit Union ("NFCU") account ending in 6884 that was opened on or around September 19, 2014 and is jointly owned by "Joseph C. Lucsok" and "Anna Lucsok," with both as authorized signors;

b.  all funds in **Lucsok Target Account #2**, the NFCU account ending in 9545 that was opened on or around September 19, 2014 and is jointly owned by "Joseph C. Lucsok" and "Anna Lucsok," with both as authorized signors;

c.  all funds in **Lucsok Target Account #3**, the NFCU account ending in 4369 that was opened on or around February 20, 2018 and is jointly owned by "Joseph C. Lucsok" and "Anna Lucsok," with both as authorize signors;

d.  all funds in **Lucsok Target Account #4**, the JP Morgan Securities LLC ("JPMS") account ending in 9580 that was opened on or around October 15, 2023 in the name of "Anna Lucsok;"

e.  all funds in **Lucsok Target Account #5**, the JPMS account ending in 9581 that was opened on or around October 15, 2023 in the name of "Anna Lucsok;"

f.  all funds in **Lucsok Target Account #6**, the Voya Financial ("VF") account opened on or around September 21, 2023 in the name of "Anna Lucsok," specifically Zynex, Inc. 401(k) Plan, Plan Number 862196, belonging to Anna Lucsok (SSN ***-**-4044 and DOB 10/**/1985);

2

g. **Lucsok Target Vehicle #1**, a 2021 Porsche Macan 4-door SUV with Colorado license plate number BNBR20 and VIN # WP1AA2A51MLB02630 and that is registered to Anna Lucsok and Joseph Lucsok of 6552 S Biloxi Way, Aurora, Colorado 80016; and

h. **Lucsok Target Vehicle #2**, a 2022 Volkswagen Taos 4-door SUV with Colorado license plate number DZCP88 and VIN # 3VVAX7B21NM095410 and that is registered to Anna Lucsok of 6552 S. Biloxi Way, Aurora, Colorado 80016.

These accounts and vehicles are further described in Attachment A-1 (Lucsok Targets Accounts #1, #2, and #3 with NFCU), Attachment A-2 (Lucsok Target Accounts #4 and #5 with JPMS), Attachment A-3 (Lucsok Target Account #6 with VF), and Attachment A-4 (Lucsok Target Vehicles #1 and #2).

4. *SANDGAARD In Rem Actions*. I also make this affidavit in support of a verified complaint for forfeiture in rem for the following financial accounts (collectively the "SANDGAARD SUBJECT FUNDS") and vehicles (collectively, the "SANDGAARD SUBJECT VEHICLES"):

a. all funds in **Sandgaard Target Account #1**, the Bank of America ("BoA") account ending in 3472 that was opened on or around January 30, 2016, in the name of "Thomas Sandgaard" with Thomas Sandgaard as the sole authorized signer,

b. all funds in **Sandgaard Target Account #2**, the BoA account ending in 0540 that was opened on or around December 7, 2020, in the name of "Sandgaard Capital LLC" with Thomas Sandgaard and Kyle Henderson as joint owners and authorized signers,

c. all funds in **Sandgaard Target Account #3**, BoA account ending in 1333 that was opened on or around April 19, 2021, in the name of "Thomas Sandgaard and Lisa M. Wallace" with Thomas Sandgaard and Lisa M. Wallace as joint owners and authorized signers,

d. all funds in **Sandgaard Target Account #4**, BoA account ending in 5265 that was opened on or around August 25, 2023, in the name of

3

"Sandgaard Aviation LLC" with Thomas Sandgaard and Kyle Henderson as joint owners and authorized signers,

e. **Sandgaard Target Vehicle #1**, a 2021 Porsche Cayenne SUV with Colorado license plate number EEYQ99 and VIN # WP1AB2AY8MDA28740, which is registered to Thomas Sandgaard of 1175 Castle Pointe Drive, Castle Rock, CO 80104,

f. **Sandgaard Target Vehicle #2**, a 2019 Mercedes-Benz AMG GT 63 4-Door Hatchback with Florida license plate number 79DTVE and VIN # WDD7X8JB5KA008056, which is registered to Sandgaard Capital LLC of 6001 N. Ocean Drive, Apartment 1204, Hollywood, FL 33019, and Sandgaard Capital LLC is a company owned by Thomas Sandgaard.

g. **Sandgaard Target Vehicle #3**, a 2020 BMW X3 XDRIVE30 SUV with Colorado license plate DXLF73 and VIN # 5UXTY5C05L9D19894, which is registered to Sandgaard Capital, LLC, of 1175 Castle Pointe Drive, Castle Rock, CO 80104, and Sandgaard Capital LLC is a company owned by Thomas Sandgaard,

These accounts and vehicles are further described in Attachment B-1 (Sandgaard Target Accounts #1, # 2, #3, and #4 with BoA), and Attachment B-2 (Sandgaard Target Vehicles #1, #2, and #3).

5.     I based this affidavit on my personal knowledge, information and documents provided to me by other investigators assigned to this investigation, and information and documents provided by third parties.  Because this affidavit is submitted for the limited purpose of supporting a verified complaint for forfeiture in rem, I have not included each and every fact that has been revealed to me through the course of this investigation.  Instead, I have set forth only the facts that I believe are necessary to evaluate the legal basis for the initiation of the civil forfeiture action.

6.     *Probable Cause re Offenses.*  As described below, there is probable cause to believe that Thomas Sandgaard ("SANDGAARD") and Anna Lucsok ("LUCSOK")

4

committed crimes that include mail fraud (18 U.S.C. § 1341), health care fraud (18 U.S.C. § 1347), and conspiracy to commit mail fraud and health care fraud (18 U.S.C. § 1349), each of which is a specified unlawful activity ("SUA").  As described below, there is also probable cause to believe that SANDAARD and LUCSOK's handling of proceeds from these SUAs constituted money laundering in violation of 18 U.S.C. §§ 1956 and 1957, and similarly that SANDGAARD and LUCSOK's handling of proceeds from that money laundering constituted additional violations of 18 U.S.C. §§ 1956 and 1957.[1]

7.        *Probable Cause for In Rem Action.*  As described below, there is probable cause to believe that funds in or used to obtain the LUCSOK SUBJECT FUNDS and LUCSOK SUBJECT VEHICLES as well as the SANDGAARD SUBJECT FUNDS and SANDGAARD SUBJECT VEHICLES were derived from proceeds traceable to the SUAs, and that as such, the traceable portion of those funds, property derived from those funds, and any property traceable to such property are subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), 982(a)(7), and 984 and 28 U.S.C. § 2461.  There is also probable cause to believe that the entirety of the LUCSOK SUBJECT FUNDS and LUCSOK SUBJECT VEHICLES as well as the SANDGAARD SUBJECT FUNDS and SANDGAARD SUBJECT VEHICLES were "involved in" money laundering (under 18 U.S.C. §§ 1956 and 1957) or are traceable to

---

[1] Mail fraud (by virtue of 18 U.S.C. §§ 1956(c)(7)(A) and 1961), health care fraud (by virtue of 18 U.S.C. § 1956(c)(7)(F)), conspiracy to commit mail fraud (by virtue of 18 U.S.C. §§ 1956(c)(7)(A) and 1961), and conspiracy to commit health care fraud (by virtue of 18 U.S.C. §§ 1956(c)(7)(F) and 24) are each a specified unlawful activity SUA.  Money laundering, either in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, is also an SUA (by virtue of 18 U.S.C. §§ 1956(c)(7)(A) and 1961).

property involved in money laundering and as such are subject forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).  Property "involved in" money laundering includes the money being laundered; money or other property that is commingled with it or obtained in exchange for it, when the money laundering takes place; and any property used to facilitate the money laundering.

## PROBABLE CAUSE (FRAUD & CONSPIRACY)

8.      Law enforcement is investigating a scheme involving Zynex, Inc. and its subsidiary, Zynex Medical (collectively, "Zynex"), to fraudulently bill government and private health care payors for medical devices and supplies.  During the course of the investigation, the investigating agents and others have gathered and reviewed documents and billing records obtained from Zynex, various health care payors and other sources and interviewed numerous current and former employees of Zynex, as well as payor representatives and other witnesses.  The evidence gathered in this investigation provides probable cause to believe the following:

9.      THOMAS SANDGAARD (SANDGAARD) was the founder and the Chief Executive Officer of the medical device company Zynex since Zynex's inception in 1996 until on or about August 18, 2025.

10.      ANNA LUCSOK (LUCSOK) was the Chief Operating Officer and/or billing director of Zynex from in or about January 2021 until in or about September 2025. LUCSOK joined Zynex in February 2018 and served as the Vice President of Reimbursement from in or about October 2019 until about January 2021.

11. Beginning in or about at least 2017 and continuing until in or about late 2025, SANDGAARD and LUCSOK orchestrated a fraud scheme to obtain millions of dollars by fraud from government and private health care payors and patients, as well as to defraud investors in Zynex by concealing that the company's billings and revenues were driven by fraud.

12. As part of this scheme, SANDGAARD and LUCSOK caused Zynex to routinely ship excessive and unnecessary medical supplies to patients and to submit millions of dollars in false and fraudulent claims and billings to health care payors and patients for medical devices and supplies that were not medically necessary and not covered by these insurance programs and not agreed to by the patients.

13. SANDGAARD and LUCSOK continued these fraudulent and illegal practices despite being notified many times that their billing practices were improper and fraudulent.

14. In total, between in or about 2017 and late 2025, SANDGAARD and LUCSOK caused Zynex to collect more than $873 million for its products, of which more than $600 million was for supplies, and more than $273 million was for devices. The vast majority of the supplies' billings were for unnecessary and improperly billed supplies.

15. SANDGAARD and LUCSOK caused the fraudulent billing of devices, and excessive shipments and billing of supplies, including electrodes and batteries commercially available at much lower prices, to be billed at more than a hundred dollars per set, in order to inflate the revenues and profits they were reporting to the

7

market for Zynex. According to Zynex's United States Securities and Exchange Commission (SEC) filings, the supplies billings accounted for approximately 70% of Zynex's revenues each year.

16.    SANDGAARD and LUCSOK used these fraudulent billings, and the revenues derived therefrom, to fraudulently inflate the company's financial reporting and drive up the stock price of Zynex. As part of this scheme, SANDGAARD and LUCSOK caused Zynex to issue false and misleading statements about its financial performance, operational practices, risks, and compliance with insurers' reimbursement policies and concealed the ongoing material fraud upon patients and insurers. These statements concealed, among other things, the systemic "oversupplying scheme" whereby SANDGAARD and LUCSOK caused Zynex to ship excessive quantities of supplies, such as electrode pads and batteries, to patients, and billed insurers for hundreds of millions of dollars more than was permitted or medically necessary.

17.    SANDGAARD and LUCSOK's fraud schemes were to personally enrich themselves in the form of large salaries and bonuses, stock, stock options and payments for stock repurchases, among other ways. SANDGAARD and LUCSOK used the funds transferred to themselves from the proceeds of these frauds to benefit themselves and others. They engaged in transactions involving fraud proceeds exceeding $10,000 to pay for, among other things, a private jet, a Lamborghini, a McLaren Model 72S Spider, cosmetic procedures, real estate and a European soccer team.

**Knowingly Billing Unnecessary and Excessive Amounts of Supplies**

18.     In order to bill health care benefit programs such as Medicare, Medicare Advantage, other government health care payors and private insurers, providers use a five-digit Current Procedural Terminology (CPT) code that identifies the nature and complexity of the service provided. The CPT codes are listed in the CPT manual, which is published annually by the American Medical Association (AMA). CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Similarly, Healthcare Common Procedure Coding System (HCPCS) codes are standard codes that represent medical procedures, supplies, products and services and are represented by a letter followed by four numeric digits. Virtually every medical procedure has its own CPT or HCPCS code and insurance companies pay a specified amount of money for each code billed.

19.     In order to submit a claim for payment to a health insurance program, providers must obtain the patient's consent to access and use their confidential health care information and identity information such as their name, health care insurance identifier number, and date of birth.

20.     SANDGAARD and LUCSOK caused Zynex to fraudulently bill, on a monthly and/or recurring basis, many multiples of CPT codes A4556 (electrodes), A4557 (lead wires) and A4630 (batteries) rather than the bundled codes A4595, which covers, among other things electrodes and batteries, despite explicit CMS guidance noted above that provides that only A4595 should be billed, and specifically providing that A4556 (electrodes unbundled) and A4630 (batteries unbundled) should not be billed with this type of electrostimulation device.

21.     SANDGAARD and LUCSOK caused Zynex to ship and bill the unbundled codes in volumes as large as 32, 64, or 128 electrode pairs to individual patients per month, sometimes charging up to or more than $1,700 per month for these supplies (which are available on the internet for a fraction of this cost).

22.     SANDGAARD and LUCSOK caused Zynex to ship excessive supplies to patients and submit fraudulent billings for those supplies even when numerous patients communicated to Zynex that they had too many supplies and wanted them to stop sending them more supplies and stop billing for those supplies.

23.     SANDGAARD and LUCSOK continued the practice of automatically shipping and billing monthly supplies without medical need even after many patients complained about the excessive supplies, surprise billing, and the difficulty of getting Zynex to stop shipping them, and complained both directly to Zynex, and to organizations such as the Better Business Bureau, including, the following two examples:

a.      1/11/2022: [T]hey kept mailing me supplies and I kept getting denials. I called today and was informed that I owe a tremendous amount of money. I also was told that they do not bill Medicare. I live on $1100.00 dollars a month and can not [sic] afford much period. I told them I could send back most of the supplies and the machine back. She informed me that there still would be a rental fee and supply fees. I told her that I could not even afford food at this point.

b.      1/24/2023: I was very very clear with [the Physical Therapist] that I could not afford any out of pocket expense and he was very very clear that this was completely covered by insurance. I received the product and then continued to received [sic] batteries and electrodes. AFTER NINE MONTHS I received a bill with 27 charges for supplies. This was the first bill I ever received, they just

kept racking up the charges and they waited nine months to send the bill. The minute I received it, I called the company, and they were unable to connect me with the billing department, we set-up a call back – still waiting. I feel like this company is a total SCAM.

24. SANDGAARD and LUCSOK continued the practice of automatically shipping and billing monthly supplies without medical need despite the fact that many of its own employees raised concerns that these and other Zynex practices were improper, unethical, fraudulent and contrary to Payors' requirements.

25. Far from listening to these concerns raised by their own employees and stopping the fraudulent "oversupply" scheme, SANDGAARD and LUCSOK labelled employees who raised such concerns as "non-aligned" or "toxic" and often caused them to leave the company and also mandated that Zynex not hire billing employees with prior experience in coding.

26. SANDGAARD and LUCSOK caused Zynex to continue to automatically ship and bill supplies for the NexWave and other electrotherapy devices without any demonstration of medical necessity, when they knew these practices violated CMS guidance as well as Payors' policies and directions, and despite receiving numerous communications from Payors stating that the practice of auto-shipping was not allowed, including, as early as 2017, the direction from Payor P: "Auto Shipping of monthly supplies is not allowed."

27. SANDGAARD and LUCSOK caused Zynex to continue to automatically ship and bill excessive quantities of supplies for the NexWave and other electrotherapy devices on a monthly basis, without determining whether the patients had a need for

11

those supplies, despite the fact that, for example, on or about April 3, 2023, Payor H, in a letter forwarded to LUCSOK, put Zynex on pre-payment review, for, among other things, billing services/supplies that had not been requested. It stated:

> [Y]ou are not following [Payor H's] guidelines which **requires the provider to ensure the patients actually need the supplies before sending them. [Payor H] does NOT support or endorse auto-shipping**. This is stated in our April 5, 2023 letter. Plus, you were educated on this in November 8, 2019. We have contacted multiple patients who stated they get supplies each month without Zynex contacting them. Plus, the patients have shared they do not need any more supplies and have contacted Zynex to stop sending them, but Zynex keeps sending. [Emphasis added]

28.     SANDGAARD and LUCSOK caused Zynex to continue to bill Payors using unbundled codes, including A4556, despite repeated notice that this practice was impermissible and illegal, including on or about March 24, 2020, Payor L wrote to SANDGAARD that Zynex could not bill code A4556 and should only use A4595, the bundled code, for supplies. The letter also noted that Payor L's review revealed Zynex was "submitting claims for TENS electrodes using CPT code A4556." The letter directed SANDGAARD to Payor L's Professional Provider Office Manual, which points out that code A4556 is not separately allowed for reimbursement. Later the same day, SANDGAARD responded to Payor L copying LUCSOK "Thank you very much for letting us know. We will ensure that our billing department adhere to the [Payor L] guidelines at all times."

29.     SANDGAARD and LUCSOK caused Zynex to continue to bill Payors using unbundled codes, including A4556, despite the fact that they received notice from Payor H repeatedly that this was not permitted, including in repeated letters and email

12

messages between in or about April 2023 and March 2024, in which Payor H wrote, among other things, "The use of code A4556 is improper." Payor H also wrote: "Specific to the billing of Code A4556, we continue to see claims using this procedure code as recent as a claim for 01/03/2024. If you are acknowledging this code is being used incorrectly, then you also need to cease billing for it."

30.    Despite the fact that, on or about March 29, 2024, Zynex acknowledged to Payor H that "codes A4556 (unbundled code for electrodes) and A4630 (unbundled code for batteries) were billed incorrectly," SANDGAARD and LUCSOK caused Zynex to continue to bill improperly using A4556 and A4630 for unbundled supplies through at least the fall of 2025.

31.    SANDGAARD and LUCSOK continued these practices even after, beginning in about late 2022, and continuing through 2023, Zynex received notice from a group of financial reporters who published a series of articles in a subscription newsletter about Zynex's fraudulent billing practices and the risk to its stock as a result. These articles included reports of complaints from patients about excessive supplies and other improper billing practices, and corroborative statements from Zynex employees. The December 2022 article stated:

> Moreover, complaints made to the FTC by both Zynex customers and employees and obtained by The Capitol Forum through an additional public records request indicate that the company is deceiving patients and shipping far more supplies than necessary. 'Normal electrode usage for TENS is approximately 2-4 pairs per month, the number covered by Medicare and most commercial insurers such as Aetna," a complaint to the FTC reads, "I have personally received over 640 pairs of electrodes from Zynex for a single prescription. Based on Medicare's average coverage of 3-

13

pairs per month, Zynex sent me over 20x the usual amount, enough for 18 years of constant use."

32.     SANDGAARD and LUCSOK continued these practices after one article published by Capitol Forum, on or about May 9, 2023, described a beneficiary "receiving hundreds and hundreds of unnecessary electrodes from Zynex and sent us pictures of her stash of electrodes." The article alleged: "Zynex is sending more electrodes than are medically necessary and this appears to mirror a False Claims Act case [against a similar company] from 2018."

33.     Instead of addressing the concerns raised by these reporters, SANDGAARD hired someone to attempt to disrupt the lives of the reporters with the intent of retaliating against them and deterring them from further alerting the markets to these issues. These efforts included having someone sign the reporters up for therapy sessions without their knowledge or permission and listing their issues as including erectile disfunction. They also included sending used female underwear to one reporter's spouse at the reporter's home and sending the spouse a thank you card detailing the reporter's alleged "illicit behavior" – all apparently with the intent to convince the spouse that her husband was being unfaithful.[2]

34.     SANDGAARD and LUCSOK continued the auto-shipping even after, in or about June 4, 2024, the medical journal STAT published an article about Zynex

---

[2] In my January 9, 2025, Affidavit in Support of Warrants Authorizing Disclosure of Location Information, in paragraph 26, it appears that the statement that these efforts included having someone "send chickens to the home of one of the reporters" may be a mistake or misunderstanding of what was reported to have been sent.  It appears that what was reported to have been sent included "confetti bombs."

entitled "How a device maker inundated pain patients with unwanted batteries and surprise bills" and described in great detail the oversupply scheme whereby Zynex sent excessive monthly supplies, such as electrode pads and batteries, to generate higher billings to insurers. It described a sample patient who was "drowning in batteries she doesn't need" and was billed by Zynex for almost $1,000 after Zynex had falsely assured her that the costs would be covered by her insurance. The article also stated that multiple other patients interviewed reported similar situations and that there were dozens of similar complaints in online forums. The reporter also noted that former employees confirmed the scheme's systemic nature.

35.    When the STAT reporter asked SANDGAARD and LUCSOK, among others at Zynex, for comments prior to publishing the article, and asked "[w]hy do you automatically send batteries and electrode pads? Do you check in with patients to ask if they need them?" rather than respond to the questions, LUCSOK arranged for the email to be deleted from email boxes seen by others at Zynex.

36.    SANDGAARD and LUCSOK, throughout this time-period, continued to implement policies and projects at Zynex to implement or augment auto-shipping of large amounts of supplies to patients and auto-billing without first conferring with patients to determine if the supplies were needed, including special projects to try to increase gross billings (which were used to calculate the percentage of revenue recognized) just before the end of a quarter or year, in order to meet revenue targets forecasted for Zynex.

37.    SANDGAARD and LUCSOK, caused a message to be sent to the Zynex billing team, on or about August 6, 2021, that stated "Going forward if a patient is not set up on supplies, and there is no note that they discontinued supplies, we need to set them up on supplies. We will no longer be sending a note to patient support asking them to reach out to the patient to confirm or ask if the patient would like to be set up on supplies."

38.    On or about September 19, 2021, SANDGAARD asked LUCSOK "what we are doing to ensure we are exceeding $92M [in billings] in September?" and LUCSOK responded, among other efforts, "We're having the team look for accounts … where supplies can be increased … this will … increase the amount of gross billings going on in September." As indicated by LUCSOK, this increase in supply billings was driven not by increased patient need, but by the gross billing and revenue goals for the quarter.

39.    SANDGAARD and LUCSOK, on or about July 19, 2023, caused Zynex to implement a special project to restart supplies for 486 patients, without determining if they needed the supplies, in order to "generate another $300k in Gross Billings for this month and next." The directions provided that some patients will not be notified at all that their supplies are restarting, and some will simply be told that their scheduled supply shipment was missed and they have shipped it." None of the patients were to be contacted to find out if they actually needed the supplies.

40.    Instead of stopping the use of A4556, on or about January 8, 2024, SANDGAARD and LUCSOK, in order to meet gross billing and revenue targets to

report to the public, caused Zynex billing staff to engage in a special project to add larger quantities of electrodes to a list of patients and bill them under A4556.

### Other Fraudulent Billing Practices

41.     SANDGAARD and LUCSOK caused Zynex to bill Payors and patients for the NexWave and other electrotherapy devices and associated supplies using a variety of other fraudulent billing practices, including as described below.

### Misrepresenting Diagnosis Codes

42.     SANDGAARD and LUCSOK caused Zynex to bill Payors and patients using codes for diagnoses that they knew were not eligible for reimbursement.

43.     For example, after in or about March 2020, when TRICARE determined that it would not reimburse any TENS unit for use to treat low back pain, SANDGAARD and LUCSOK caused Zynex employees to misrepresent the diagnosis codes to TRICARE and other Payors by removing codes from billings to avoid mention of the diagnosis of low back pain and instead bill for some other covered condition that their billers could find in the patient records – without regard to whether the prescriber had identified it as the basis for the prescribing of the NexWave and associated supplies.

44.     It was further part of the conspiracy that, on or about January 22, 2021, LUCSOK wrote to SANDGAARD, noting that Payor U appeared to be denying claims for low back pain (similar to TRICARE). "I'll have the team rebill all claims without the [low back pain] code and see if they reprocess" and SANDGAARD responded: "Makes sense," thereby agreeing that upon denial of claims submitted with the diagnosis code

17

actually used in the physician's order, Zynex would remove that code and rebill the claims, without conferring with the prescriber as to whether the altered coding was justified.

45.     SANDGAARD and LUCSOK continued to direct Zynex employees to substitute other diagnoses for the non-covered diagnoses selected by the prescribers even, after, in or about December 2022, TRICARE wrote to Zynex to recoup funds, asserting that Zynex had billed for "services that were not rendered and/or reimbursable" and identifying cases where Zynex billed a code other than M54.5 (low back pain), but the medical record only supported M54.5, which was not a covered diagnosis. This notice stated that Zynex had engaged in "Misrepresentation of diagnosis" in billing for services that were actually for low back pain but listed another code and that such a breach of the participation agreement is "a fraudulent act."

### Misrepresenting Multi-Modal Nature of NexWave Device

46.     SANDGAARD and LUCSOK hid and caused others to hide the multi-modal nature of the device after, or about March 9, 2020, Payor C, notified Zynex of an overpayment of approximately $1.6 million following an audit and thereafter objected to the billing of the NexWave due to, among other issues, its unproven combination of multi-modality functions i.e. TENS (Transcutaneous Electrical Nerve Stimulation), NMES (Neuromuscular Electrical Stimulation) and IFC (Interferential Current).

47.     In or about November 2020, after Payor C had advised LUCSOK that it would not reimburse for the unproven multi-modal device, LUCSOK directed Zynex employees to create altered and blurred invoices to hide the fact that the NexWave was

18

a multi-modal device, and then directed Zynex billing employees to use the new blurred invoice to bill all commercial insurers.

48.     SANDGAARD and LUCSOK thereafter caused Zynex to bill the NexWave to Payor C and all other commercial payors with the altered and blurred invoices set forth below as Figure 1 showing only one mode – even though they were actually marketing and shipping the NexWave as a multi-modal device.

Figure 1

At that time, the unaltered marketing materials for the NexWave shows it with the three modalities clearly visible on the blue buttons as shown in Figure 2 below:

Figure 2



49.    In or about February 2021, LUCSOK falsely reported to Payor C that ZYNEX would provide Payor C patients with a "signle [sic] modality devices" but in fact continued to supply and bill the NexWave with the altered invoice to disguise the three modalities.

50.    SANDGAARD and LUCSOK billed and caused Zynex to bill various health care Payors and patients contrary to correct coding principles, the requirements of the Payors and the agreements of the patients, including manipulation of when a device was billed as a rental or for purchase, and changing the dates of service to avoid restrictions on payment for items billed on the same date together, caused the submission of fraudulent claims to Payors and patients.

**Waiving Co-Pays, Misrepresenting Pricing and Surprise Billings**

51.    SANDGAARD and LUCSOK caused Zynex employees to not tell potential patients about the full costs of the device and supplies for which they could be

charged in order to induce them to agree to accept the device and monthly supplies, and often delayed billing patients for many months or more than a year and then sent them later bills for amounts the patients did not realize would be charged.

52.    SANDGAARD and LUCSOK caused Zynex to report to Payors that the price of the NexWave and other electrotherapy devices was between $995 and $2,995 but directed Zynex staff (1) to tell patients that if their insurance did not cover the device, they would not be charged more than $250 for the device, and (2) not to tell the insurers about the patient out of pocket price.

53.    SANDGAARD and LUCSOK continued these practices even after, on or about March 9, 2020, Payor C notified Zynex of an overpayment of approximately $1.6 million following an audit and identified as one of the bases for the overpayment claim the fact that Zynex was routinely and improperly waiving cost-sharing fees. The letter specifically noted that such routine waiving of the patient's share could be fraudulent, with citations to relevant case law.

54.    On or about March 15, 2020, LUCSOK texted a Zynex sales manager and commented that Payor C "is asking for $1.6 M back because they're claiming we've engaged in fraudulent activity for waiving patient's deductible and coinsurance. I feel like I'm going to throw up." When the sales manager replied, "Oh shit!!  Aren't we allowed to settle with the patient?" LUCSOK further commented:

> It's a grey area but I bet the charges they're questioning are from 2017 when we were billing an insane amount and then calling the patient telling them we'd waive deductible if they stay on supplies. We're allowed to have a "financial need policy" meaning if the patient can't afford it, we can settle. This will be difficult to fight depending on what information they have.

When the sales manager responded, "Oh my!! And your job gets harder 🤮" LUCSOK replied: "I feel sick like not coronavirus sick but I'm going to throw up sick." On or about March 16, 2020, LUCSOK forwarded the Payor C refund request to SANDGAARD to discuss.

55.      Even after the notice from Payor C, SANDGAARD and LUCSOK caused Zynex employees to continue to regularly waive patient cost sharing obligations without notifying the insurers that Zynex was not complying with the requirements of their policies, all in order to induce patients to accept Zynex's products and reduce the likelihood of patients' complaining about Zynex's billings, and thus allow Zynex to continue its excessive and fraudulent billing to the insurers.

56.      SANDGAARD and LUCSOK caused Zynex to continue these fraudulent and improper practices even after, in or about January 2025, Zynex was recognized as a top ten "winner" for the "egregious U.S. healthcare profiteering on account of its "[s]hady billing practices" on the ground that "Patients received Zynex devices understanding the expense would be covered by insurance" but then "got unsolicited supplies of items like batteries and electrodes delivered to them (often excessive quantities), for which they were charged." The article reporting on the award included the following quote:

> "This is just classic over-billing. It's fraud," [PK], a senior director at the research group US Pirg and judge on the panel, said. "The patients feel that they owe the money because they already received the supplies. We see a lot of this kind of abuse within the pain management field." https://www.theguardian.com/us-news/2025/jan/07/annual-awards-healthcare-profiteering

22

**Marketing NexWave with Unproven and Misleading Claims**

57.    SANDGAARD and LUCSOK caused Zynex to market the NexWave and other electrotherapy devices with misleading and unproven claims such as that it could reduce oral pain medication use by 50%, and that its Interferential Mode was 40X Stronger than TENS and could provide "Pain Relief Can Last for Hours" with "No Side Effects." These promotions often included the image below in Figure 3, which was provided by Zynex with a March 28, 2024, email copied to LUCSOK:

Figure 3

58.    SANDGAARD and LUCSOK continued to direct Zynex employees to market the NexWave and other electrotherapy devices this way, even though they knew that Zynex had no valid studies of these devices for these claims and no such claims were cleared or approved by the FDA.

59.    SANDGAARD and LUCSOK caused Zynex to market its electrotherapy devices by claiming that it was an alternative to opioids and to reduce oral pain medication use even after, on or about March 4, 2021, the FDA sent Zynex a letter, that was shared by SANDGAARD and LUCSOK, which stated that it had come to the FDA's attention that Zynex, including on its website, was "marketing NexWave in a manner that appeared to violate the Food, Drug & Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FDCA"), including by making the following claims:

> NexWave reduces or eliminates opioid use,
> IFC is like an extended relief opioid;
> opioid side effects - respiratory depression, opioid induced constipation …;
> can reduce or eliminate opioid use,
> penetrates deeper to release endorphins,
> none of the side effects associated with opioids or OTC medications.

The letter requested that all uncleared marketing claims be removed immediately from Zynex's website and all marketing materials.

60.    SANDGAARD and LUCSOK caused Zynex to continue to market the NexWave by claiming that it was an alternative to opioids and could reduce oral pain medication use, even after a Zynex quality manager advised them that Zynex did not have data to support the comparisons to opioids or claims as to IFC or other claims identified by the FDA. This Zynex quality employee manager further advised: "Based on research online with FDA database, etc. these type claims, warnings have led to warning letters previously with fines associated with the false claims," and stated that Zynex needed the following corrective actions:

Remove anything related to Opioids from any device related material per the letter and review all other devices as well. … On or around anything with our devices, no claims or discussion of Opioids. ….

[O]pen [a Corrective and Preventative Action] to address all off label issues. …

Remove any and all content from website/marketing material which includes any potential false claims. … Update process to ensure appropriate people review and approve all material which is placed in any marketing format (brochures, social medica, website, etc). Preventive action. Review any other products marketing material to ensure any and all claims made align with the 510k clearance.

61.    SANDGAARD and LUCSOK continued to cause Zynex to use such fraudulent and unsubstantiated marketing claims despite the fact that, when LUCSOK suggested relying upon studies of electrostimulation units generally (but not based upon Zynex products), the Zynex quality manager further clarified that this was not permitted, as follows:

[F]rom my experience legal would get involved in something like this.…Those studies are fine data points from a general sense of IFC/Tens and Opioids. **However, we can't make any claims based on those. Only the FDA has the authority to approve claims after they review all data as part of a submission and any data would have to be very specific to our device and any clinical trial data/studies that we would own/have**. In lieu of that we can only make claims related to what was originally approved by the FDA in the 510k [which did not include any claims relating to opioids or strength of IFC]. [Emphasis added].

62.    After LUCSOK shared all of this information and the quality manager's recommendations with SANDGAARD, SANDGAARD dictated that Zynex "will not stop claiming that opioids are addictive and that the NexWave is a good alternative for pain relief."

63.     It was further part of the conspiracy that, on or about March 26, 2021, LUCSOK wrote to the FDA and falsely claimed that Zynex had removed "all content from our website and marketing materials referring to the NexWave reducing or eliminating opioid use as per your letter dated March 4, 2021," despite the fact that, at the direction of SANDGAARD and LUCSOK, Zynex continued to market the NexWave as a way to reduce opioid use and with other uncleared claims through in or about at least late 2025.

### Use of Invalid Prescriptions

64.     SANDGAARD and LUCSOK knowingly caused Zynex to distribute its prescription-only NexWave device without a valid prescription by distributing the devices based upon orders signed by persons not licensed in their states to write prescriptions for such devices, including physical therapists, registered nurses and physical therapist assistants.

65.     SANDGAARD and LUCSOK caused the submission of fraudulent claims to patients and to federal and commercial health care payors that knowingly and falsely represented that there was a valid prescription for the device when in fact no such valid prescription had been written.

66.     SANDGAARD and LUCSOK caused to be shipped by mail to patients across the country, including those in Rhode Island, NexWave and other electrotherapy devices and supplies and caused them to be fraudulently billed to Payors and patients. This includes, as examples, the following mailing and claims for medically unnecessary

supplies that SANDGAARD AND LUCSOK caused Zynex to automatically mail to the patients in Rhode Island from Colorado.

| Beneficiary | DME Item and Code | Approx. Date | Approx. Amnt. Billed |
|---|---|---|---|
| Patient 2, RI (AG) | TENS Suppl (A4595) | 10/5/2024 | $871.92 |
| Patient 3, RI (CR) | TENS Suppl (A4595) | 11/18/2024 | $871.92 |
| Patient 4, RI (JR) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 10/20/2022 | $1,584 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 5, RI (JP) | TENS Suppl (A4595) | 2/1/2024 | $217.98 |
| Patient 6, RI (KK) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 3/10/2025 | $1,584.00 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 7, RI (MB) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 1/19/2023 | $1,584.00 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 8, RI (NS) | TENS Suppl (A4595) | 3/4/2024 | $217.98 |
| Patient 9, RI (AP) | 20 Electrode Pairs (A4556) 8 Batteries (A4630) | 12/11/2023 | $990.00 (electrodes) $79.92 (batteries) $1,069.92 Total |
| Patient 10, RI (EH) | Electrodes, 20 (A4556) Batteries (A4630) | 3/1/2022 | $990.00 (electrodes) $59.94 (batteries) $1,049.94 Total |

**SANDGAARD and LUCSOK Receipt of Proceeds of these Frauds**

67.    SANDGAARD and LUCSOK caused the submission of fraudulent claims to patients and to federal and commercial health care payors and caused the proceeds from Zynex's fraudulent billing to be deposited into its corporate accounts and from those accounts, to SANDGAARD and LUCSOK in the form of salary, bonuses, other purported compensation payments, stock and stock options, as well as in payment for repurchase of stocks.

27

**False Statements to Conceal Fraud and Invalid Revenues from Investors**

68.     As set forth in further detail below, SANDGAARD and LUCSOK knowingly and intentionally caused Zynex to make false and fraudulent statements filed with the SEC by:

a.      making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.      engaging in acts, practices, and courses of business that would and did operate as a fraud and deceit in connection with the purchase and sale of a security, that is, the stock of Zynex.

**Concealing Fraudulent Activities and Invalid Revenues**

69.     SANDGAARD and LUCSOK directed the fraudulent activities described above, set unrealistic targets for gross billings and revenue, and ramped up the pressure on the employees at the end of each quarter and year, including to bill improperly and pull forward billings from the next year or quarter, all in order to meet specific unrealistic expectations for revenue and growth that SANDGAARD and Zynex had projected to the markets.

70.     From in or about 2017, and through in or about late 2025, SANDGAARD and LUCSOK caused Zynex to defraud investors and falsely inflate and improperly recognize revenue by reporting revenue that SANDGAARD and LUCSOK and their co-conspirators knew was not valid revenue from proper billings and was the result of fraud and caused ZYNEX to materially misstate the financial statements incorporated into its annual and quarterly financial statements filed with the SEC.

71.     SANDGAARD and LUCSOK knowingly and intentionally made public statements, including in earnings calls, Zynex's financial reporting and SEC filings, to make it appear that Zynex was earning more valid revenue, was more profitable, and growing at a more accelerated pace than it actually was.

72.     SANDGAARD and LUCSOK caused Zynex to claim to the public that it was an extremely successful medical device company, touting consistent revenue growth and increases in patient orders. For example, in a March 13, 2023 press release, Zynex reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders and seven consecutive years of profitability.

73.     SANDGAARD and LUCSOK were artificially inflating Zynex's stock price by making and causing to be made false and misleading statements about Zynex's financial performance, operational practices and compliance with health care laws and insurance reimbursement requirements. These statements concealed, among other things, a system oversupply scheme whereby Zynex shipped unnecessary and excessive quantities of supplies, as well as other fraudulent billing practices.

74.     From in or about 2017 through 2025, SANDGAARD and LUCSOK caused Zynex to submit to the SEC and publicly file its false quarterly and annual financial reports, including false certifications with each of its quarterly and annual financial reports certifications in which SANDGAARD falsely certified that he had reviewed this [quarterly or annual report] of Zynex and, among other things:

a. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

29

circumstances under which such statements were made, not misleading with respect to the period covered by this report.

b. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. ….

c. I have disclosed … to auditors and the audit committee [of the Zynex Board of Directors] … Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## False Statements to Auditors

75.    In order to conceal their fraudulent activities and inflate Zynex's purported revenues, SANDGAARD and LUCSOK also repeatedly made and caused to be made, false representations to Zynex's auditors, including in connection with the preparation, examination, and review of Zynex's financial statements as well as in Zynex financial statements filed with SEC, including Forms 10-Q and 10-K as well as other SEC filings. These representations included quarterly letters signed by SANDGAARD, among others, in connection with the preparation, examination, and review of Zynex's financial statements and falsely asserted that SANDGAARD was not aware of any fraud or misstatements and that the revenues of the company reflected valid billings. SANDGAARD made these representations to Zynex's external auditors, and LUCSOK confirmed and supported these representations.

76.    In preparation for each quarterly and end of year SEC filing, SANDGAARD falsely represented to Zynex external auditors that he was not aware of

any fraud and that the receivables reported in the financial statements were valid

billings, including the following, or similar words:

    a.  Receivables recorded in the consolidated financial statements represent valid billings to customers or payers for sales or other charges arising on or before the balance-sheet dates and have been reduced to their estimated net realizable value …

    b.  We are not aware of any events or circumstances which would indicate that post collection rates would not be representative of our future expected collections on outstanding billings. …

    c.  We have no knowledge of any fraud or suspected fraud that affects the entity and involves:
> Management;
> Employees who have significant roles in internal control; or
> Others when the fraud could have a material effect on the financial statements.

    d.  We have no knowledge of any allegations of fraud, or suspected fraud, affecting the entity's financial statements communicated by employees, former employees, analysts, regulators or others, except for the alleged billing issues/refund requests from [Payor U] that were disclosed to you.

    e.  We have disclosed to you all known instances of non-compliance or suspected non-compliance with laws and regulations whose effects should be considered when preparing financial statements.

Moreover, these representation letters, signed by Zynex executives, noted that

"materiality limits do not apply to representations that are not directly related to

amounts."

31

**Concealment of Refund Demands and Payment Suspensions**

77.     SANDGAARD and LUCSOK concealed from the public and investors, including through false statements to the contrary, that they knew that Zynex had received many communications from Payors asserting that Zynex's billing practices were improper and fraudulent, and that numerous Payors were demanding refunds and /or suspending payments.

78.     On or about early January 2025, after SANDGAARD and LUCSOK learned that TRICARE had suspended payments to Zynex based upon credible allegations of fraud and its audit of Zynex's billing, SANDGAARD and LUCSOK refused to promptly disclose this material information to the public, despite explicit advice from their own internal expert that this event was likely to be material to investors, and that Zynex needed to disclose it immediately by filing an SEC Form 8-K report, a form required whenever a company has a major event that shareholders should know about.

79.     On or about February 26, 2025, LUCSOK participated in a public interview in which she claimed that Zynex's success was due to their success in navigating reimbursement. In that interview, she stated that Zynex's reimbursement team had been very successful in obtaining coverage for their patients, without disclosing that in fact many Payors had stopped reimbursing Zynex, including TRICARE, which made up approximately 25% of Zynex's revenues, and had temporarily suspended payments as of December 2024.

80.     SANDGAARD and LUCSOK concealed the TRICARE suspension until on or about March 11, 2025, immediately after which Zynex's stock price dropped in one day by approximately 51%, or -$3.59 per share, from $7.00 to $3.41.

81.     Even on or about March 11, 2025, when Zynex disclosed the TRICARE suspension to explain the precipitous decline in its fourth quarter revenues, SANDGAARD and LUCSOK still did not disclose that the suspension was based upon an audit and credible allegations of fraud, but, in the time period between when SANDGAARD and LUCSOK learned of the TRICARE suspension and the March 11, 2025 disclosure of the suspension, a Sandgaard family member sold a significant amount of Zynex stock.

82.     Two days after the first disclosure of the TRICARE suspension, SANDGAARD caused Zynex to repurchase $4.8 million of his stock – even though the company could ill-afford the loss of cash at that time.

## PROBABLE CAUSE (MONEY LAUNDERING & FORFEITABLE PROPERTY)

83.      Funds from the specified unlawful activities, namely mail fraud, healthcare fraud, and the associated conspiracy were deposited into Bank of America account ending in 4559 ("BoA 4559"), owned by Zynex Medical, Inc.  BoA 4559 is a lockbox account with a general business purpose to include processing receivables and payables for Zynex.  The account was opened on or about June 4, 2018, and signors on the account included Thomas Sandgaard (CEO), Dan Moorehead (CFO), and Amanda Padilla (Controller).  Bank of America account ending in 4546 ("BoA 4546") is a business operating account owned by Zynex Medical, Inc.  The account was also opened on or

about June 4, 2018, and signors on the account included SANDGAARD (CEO), Dan Moorehead (CFO), and Amanda Padilla (Controller). Ashlie Thornburg was added as a signatory to BoA 4546 on June 15, 2021.

84. The investigation determined that fraudulently obtained TRICARE funds, namely Zynex billing conducted without establishing with the patient that the supplies were medically necessary, were deposited regularly on a month-by-month basis into BoA 4559 from approximately 2018 through 2025. By way of example, an approximate breakdown of TRICARE deposits identified within BoA 4559 from 2018 to 2022 is as follows:

| PAYORS | 2018 | 2019 | 2020 | 2021 | 2022 | Grand Total |
|---|---|---|---|---|---|---|
| TRICARE | 828,065.39 | 2,281,273.71 | 2,452,571.65 | 3,901,435.76 | 6,563,137.79 | 16,026,484.30 |

Similarly significant, namely well over $150,000, deposits continued in 2023, 2024, and 2025 from TRICARE. The last deposits from TRICARE into BoA 4559 were less than a year ago.

85. The investigation also determined that fraudulently obtained funds from private payors, including those that administered Medicare and Medicaid Advantage plans, from Zynex billing conducted without establishing supply medical necessity with patients, were deposited regularly on a month-by-month basis into BoA 4559 from approximately 2018 through 2025. By way of example, Payor H paid Zynex more than $3.1 million since 2018, all of which was deposited into BoA 4559 starting September 2018. Additionally, Payor U has paid Zynex more than $49 million, and their payments were also deposited into BoA 4559 since July 2018. Notably, Payor H and Payor U have

34

commercial, Medicare Advantage, and Medicaid Advantage Plans to which Zynex submitted claims for which it was paid. The last deposits from such private insurers in BoA 4559 were less than a year ago.

86.    BoA 4559 was the primary account used to receive payments for services billed by Zynex from Medicare, TRICARE, and private insurers. Most of those funds were transferred to BoA 4546 shortly after receipt. The last such deposit from BoA 4559 to BoA 4546 was less than a year ago. Those funds were processed through payroll and a portion of those funds were at regular intervals from 2019 through 2025 deposited into Lucsok Target Account #1 and Sandgaard Target Accounts ## 1 and 2.

87.    As described below, the funds deposited into Lucsok Target Account #1 and Sandgaard Target Accounts ## 1 and 2 from BoA 4546 were later transferred to other target accounts controlled, respectively, by LUCSOK or SANDGAARD and were used from those other accounts used to purchase assets or make payments on loans associated with LUCSOK and SANDGAARD assets.

88.    *Money Laundering Associated with BoA 4559.* Each month-to-month deposit into BoA 4559 included fraud and conspiracy proceeds (i.e., SUA proceeds), including deposits that happened less than a year ago. Based on the information set forth above in the Probable Cause (Fraud & Conspiracy) section, SANDGAARD and LUCSOK knew that those deposits included proceeds of unlawful activity. The depositing of these funds in BoA 4559 promoted the fraud and conspiracy, because BoA 4559 received payments on bills and thereby perpetuated Zynex's business operations and SANDGAARD and LUCSOK'S fraud and conspiracy. The depositing of these funds

35

and commingling of them with other funds in BoA 4559 had the natural effect of concealing the nature and source of the fraud proceeds.  Accordingly, there is probable cause to believe that the deposits of the SUA proceeds into BoA 4559 constituted promotion and concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).  Each of the deposits, all of which contained SUA proceeds, were in amounts greater than $10,000.  Accordingly, there is probable cause to believe that each of the deposits constituted money laundering in violation of 18 U.S.C. § 1957.

89.     *Money Laundering Associated with BoA 4546.*  The transfers of these funds from BoA 4559 to BoA 4546 constituted additional money laundering.  The transferred funds included, in each transfer, fraud and conspiracy proceeds as well as money laundering proceeds from BoA 4559, all of which constitute SUA proceeds, and such transfers include transfers that occurred less than a year ago.  Given their involvement in the fraud and conspiracy, it is likely that SANDGAARD and LUCSOK knew that those transfers included proceeds of unlawful activity.  The transfers to BoA 4546, Zynex's operating account through which it paid employees, maintained Zynex's operations and SANDGAARD and LUCSOK's vehicles for their fraud and conspiracy. The money movement from one account to another also served to conceal the nature and source of the fraud proceeds.  Accordingly, there is probable cause to believe that the transfers to BoA 4546 from 2019 to 2025 constituted promotion and concealment money laundering.  Also, all such deposits in BoA 4546 from BoA 4559 included SUA

36

funds and were in excess of $10,000. Accordingly, there is probable cause to believe that each transfer constituted money laundering in violation of 18 U.S.C. § 1957.

### *Forfeitability of Lucsok Target Account #1 and Sandgaard Target Accounts ## 1 and 2*

90.     Subsequent transfers and deposits of funds from BoA 4546 to Lucsok Target Account #1 and Sandgaard Targets Accounts ## 1 and 2 constituted additional money laundering such that these LUCSOK and SANGAARD accounts are subject to forfeiture. Each transfer from BoA 4546 to these accounts occurred at regular intervals, consistent with payroll payments, each transfer included SUA proceeds (proceeds of the fraud, conspiracy, laundering of money through BoA 4546), and the most recent of such transfers with respect to Lucsok Target Account #1 and Sandgaard Targets Accounts ## 1 and 2 occurred less than a year ago. Given their involvement in the fraud and conspiracy, it is likely that SANDGAARD and LUCSOK knew that those transfers included proceeds of unlawful activity. By having moved the SUA proceeds to yet another account, SANDGAARD and LUCSOK were able to conceal the nature and source of the SUA proceeds both by commingling the SUA proceeds with other funds in the accounts and by moving the SUA proceeds from Zynex's account. Accordingly, there is probable cause to believe that each of the transfer/deposit transactions constituted concealment money laundering. Furthermore, because Lucsok Target Account #1 and Sandgaard Target Accounts ## 1 and 2 are comprised of SUA proceeds commingled with other funds and given that the accounts facilitated money laundering, the contents of the accounts are in their entirety subject to forfeiture. Based on the

37

foregoing, there is also probable cause to believe that Lucsok Target Account #1 and Sandgaard Target Accounts ## 1 and 2 are comprised of SUA proceeds commingled with other funds and that the accounts facilitated money laundering, and as such, these accounts are in their entirety subject to forfeiture.

### *Forfeitability of Lucsok Target Accounts # 2 & #3*

91.     A review of Lucsok Target Account #1 reveals total deposits of $2,485,096.68 between January 2019 to November 2025.  The largest deposits to Lucsok Target Account #1 are listed below:

| | |
|---|---|
| Zynex (BoA 4546) | $1,404,541.67 |
| Raymond James Brokerage | $314,532.46 |
| *Transfers from Lucsok Target Account #2* | *$289,254.08* |
| *Transfers from Lucsok Target Account #3* | *$278,500.00* |
| Iron Crest National Title Agency | $181,286.62 |

92.     A review of Lucsok Target Account #1 reveals total withdrawals of $2,483,245.97 between January 2019 to November 2025.  The largest withdrawals from Lucsok Target Account #1 are listed below:

| | |
|---|---|
| *Transfers to Lucsok Target Account #2* | *$394,870.00* |
| *Transfers to Lucsok Target Account #3* | *$371,400.00* |
| Guardian Title Agency | $180,598.24 |
| Facilitating JPMC Account 5833 | $145,000.00 |
| United Wholesale Mortgage (Lucsok Target Property #1) | $126,592.54 |
| IRS USA Tax Payments | $104,222.25 |
| Nationstar Mortgage DBA Mr. Cooper (Lucsok Target Property #1) | $74,423.38 |
| Porsche Financial Services (Lucsok Target Vehicle #1) | $48,568.20 |
| Mass Mutual Life Insurance | $46,770.06 |
| Amazon | $40,289.81 |
| University of Miami | $31,297.00 |
| Toyota Financial | $30,663.73 |

| Credit One Bank Credit Card | $29,452.19 |
| Tynan's Volkswagen (Lucsok Target Vehicle #2) | $28,903.74 |
| Always Beautiful Med Spa | $22,447.67 |
| Stevinson Imports (Lucsok Target Vehicle #1) | $22,000.00 |
| Kuni Lexus | $21,997.58 |

93.     Less than a year ago, Lucsok Target Accounts ## 2 and 3 received respectively $3,000 and $88,000 from Lucsok Target Account #1, and those funds were commingled with all other funds in the accounts.

94.     As described earlier, there is probable cause to believe that Lucsok Target Account #1 contained SUA proceeds and accumulated them regularly on a month-by-month basis from 2019 through 2025, that the contents of the account were SUA proceeds commingled with other funds, and that LUCSOK was likely aware that that account contained proceeds of unlawful activity.  The movement of funds from Lucsok Target Account #1 to Lucsok Target Accounts ## 2 and 3 would necessarily have involved the transfer of SUA proceeds, including SUA proceeds from Lucsok Target Account #1 transferred less than a year ago.  Given LUCSOK's likely knowledge of Lucsok Target Account #1 containing proceeds of unlawful activity, it is also likely that she knew that by transferring funds from that account, she was transferring some proceeds of unlawful activity.  Furthermore, this movement of SUA proceeds from one account to another has the natural effect of concealing the nature and source of the SUA proceeds, and concealment is bolstered by LUCSOK's movement of funds back and forth between Lucsok Target Accounts ## 1 and 2 and between Lucsok Target Accounts ## 1 and 3.  This sort of cycling has the effect of clouding the nature and source of

funds.  Accordingly, there is probable cause to believe that the transfers to Lucsok Target Accounts ## 2 and 3 from Lucsok Account #1 constituted money laundering. Furthermore, because the contents of Lucsok Accounts ## 2 and 3 are comprised entirely of SUA proceeds and commingled funds and because the accounts facilitated money laundering, the contents of these accounts are subject to forfeiture in their entirety.

*Forfeitability of Lucsok Targets Accounts ## 4 and 5*

95.     A review of Lucsok Target Account #4 and Lucsok Target Account #5 reveals total deposits of $175,000.00 and $170,000.00, respectively, between November 2023 and September 2025 from Facilitating JPMC Account 5833, which was opened on or around September 28, 2023 in the name of "Anna Lucsok," with LUCSOK as the sole signor.

96.     On or around November 1, 2023, $200,000.00 was transferred from Lucsok Target Account #2 to Facilitating JPMC Account 5833, and this transfer, based on deposit activity to Target Account #2, necessarily included SUA proceeds.  On or around November 2, 2023, there was a transfer from Facilitating JPMC Account 5833 to Lucsok Target Account #4 totaling $50,000.00 and a transfer from Facilitating JPMC Account 5833 to Lucsok Target Account #5 totaling $150,000.00.  These transfers from the facilitating account would also have necessarily included SUA proceeds and funds traceable to such proceeds.

97.     On or around August 27, 2024, $145,000.00 was transferred from Lucsok Target Account #1 to Facilitating JPMC Account 5833, and this transfer, based on

40

deposit activity to Target Account #1, necessarily included SUA proceeds and funds traceable to such proceeds.  On or around August 28, 2024, there was a transfer from Facilitating JPMC Account 5833 to Lucsok Target Account #4 totaling $125,000.00 and a transfer from Facilitating JPMC Account 5833 to Lucsok Target Account #5 totaling $20,000.00.  These transfers from the facilitating account would also have necessarily included SUA proceeds and funds traceable to such proceeds.

98.    In addition, on or around September 12, 2024, September 27, 2024, and October 1, 2024, there were three transfers totaling $78,000.00 from Lucsok Target Account #4 to Lucsok Target Account #5 in the amounts of $25,000.00, $25,000.00, and $28,000.00, respectively.

99.    On or around April 16, 2025, there was a transfer from Lucsok Target Account #3 to Lucsok Target Account #5 totaling $20,000.00, and this transfer, based on deposit activity to Lucsok Target Account #3, necessarily included SUA proceeds and funds traceable to such proceeds.

100.    On or around July 14, 2025, there was a transfer from Lucsok Target Account #4 to Facilitating JPMC Account 5833 totaling $30,000.00 and a transfer from Lucsok Target Account #5 to Facilitating JPMC Account 5833 totaling $10,000.00.  On or around August 5, 2025, there was a transfer from Facilitating JPMC Account 5833 totaling $40,000.00 to Lucsok Target Account #3.

101.    A review of Lucsok Target Account #4 and Lucsok Target Account #5 revealed no other deposits to the accounts other than those described above.  Based on the analysis, Lucsok Target Account #4 received inputs of $50,000.00 from Lucsok

Target #2 via the facilitating account and $125,000.00 from Lucsok Target #1 via the facilitating account.  These input funds necessarily included SUA proceeds.  Withdrawal from Lucsok Target Account #4 did not exceed these inputs; accordingly SUA proceeds remain in Lucsok Target Account #4.  Also based on the analysis, Lucsok Target Account #5 received inputs of $150,000.00 from Lucsok Target Account #2 via the facilitating account, $20,000.00 directly from Lucsok Target Account #1 via the facilitating account, $20,000.00 directly from Lucsok Target Account #3, and a total of $78,000.00 from Lucsok Target Account #4.  These inputs of funds necessarily included SUA proceeds.  Withdrawal from Lucsok Target #5 did not exceed these inputs; accordingly SUA proceeds remain in Lucsok Target Account #5.

102.    Based on the above, funds were transferred or deposited into Lucsok Target Accounts ## 4 and 5 and those transfers each included SUA proceeds, and SUA proceeds from those transfers remain in those accounts.  Given LUCSOK's involvement in the fraud and conspiracy, she was likely aware that the transferred funds included proceeds of unlawful activity.  The movement of the SUA funds through multiple accounts until their ultimate deposit in Target Accounts ## 4 and 5 has the effect of concealing the nature and source of the SUA funds.  Accordingly, there is probable cause to believe that the deposits into these two target accounts all constitutes concealment money laundering.  Moreover, the accounts presently contain SUA funds commingled with other funds and the accounts facilitated money laundering.  Accordingly, the contents of the accounts are in their entirety subject to forfeiture.

*Forfeitability of Lucsok Target Account #6*

103.     A review of Lucsok Target Account #6 reveals that the account was effective September 21, 2023 with a transfer from the previous Zynex 401(k) plan administrator in the amount of $78,196.38.  Records indicate that the transferred balance consists of $59,662.73 of employee contributions and $18,533.65 of employer match contributions.  Records also indicate that the balance as of November 30, 2025 was $198,146.80, consisting of the following:

| Statement Dates | Employee PreTax | Employer Matching | Fees - Employee PreTax | Fees - Employer Matching | Earnings - Employee PreTax | Earnings - Employer Matching | Year End Balance |
|---|---|---|---|---|---|---|---|
| 9/27/2023 - 12/31/2023 | $64,279.29 | $20,594.32 | ($10.12) | ($3.13) | $6,356.75 | $2,008.66 | $93,225.77 |
| 1/1/2024 - 12/31/2024 | $23,000.00 | $6,258.00 | ($542.66) | ($170.04) | $11,524.39 | $3,620.48 | $136,915.94 |
| 1/1/2025 - 11/30/2025 | $23,500.00 | $7,272.39 | ($785.89) | ($239.67) | $24,140.03 | $7,344.00 | $198,146.80 |
|  | $110,779.29 | $34,124.71 | ($1,338.67) | ($412.84) | $42,021.17 | $12,973.14 |  |

104.     Based on my training and experience, I know that it is general business practice to have both mandatory and voluntary deductions made from employee's gross wages via payroll services with authorization from the employee.  I also know that it is a general business practice for companies to offer a 401(k) "employee match" to employees based on their own individual contribution.  Payroll services were expended from BoA 4546, as were contributions directly to Voya National Trust that align with bi-weekly payroll, constituting employee contributions and the "employee match."  Each such contributions would necessarily have SUA funds, as BoA 4546 regularly received SUA funds.  LUCSOK funded Lucsok Target Account #6 with voluntary contributions from her gross wages from her employer, and Zynex made matching contributions.  Accordingly, funds deposited into Lucsok Target Account #6 would necessarily have included SUA proceeds from BoA 4546, along with commingled funds from BoA 4546.

105.    Lucsok Target Account #6 would be comprised entirely of SUA proceeds and commingled funds from BoA 4546 and as such Lucsok Target Account #6 is forfeitable as property involved in money laundering.  These funds were all proceeds of money laundering (both the SUA funds and the other funds with which the SUA funds were commingled).  Moreover, LUCSOK, based on her involvement in the fraud and conspiracy, would likely have known that BoA 4546 contained SUA proceeds and that transfers into Lucsok Target Account #6 would involve proceeds of unlawful activity. In opting to fund her 401(k), she would have conducted financial transactions involving those known proceeds of unlawful activity.  The movement of the SUA funds to her retirement account from BoA 4546 would naturally have concealed the nature and source of the SUA funds.  Accordingly, there is probable cause to believe that these transactions constituted concealment money laundering, that the funds in Lucsok Target Account #6 were comprised entirely of SUA proceeds and commingled funds, and that the account is therefore forfeitable in its entirety.  Financial review of account records did not indicate any withdrawals from Lucsok Target #6; accordingly all deposited SUA proceed would still be in the account.

### Forfeitability of Lucsok Target Vehicle #1

106.    Lucsok Target Vehicle #1 was purchased from Stevinson Imports Inc. in February 2021 with a cash price of $64,105.85.  A down payment of $22,000.00 to Stevinson Imports Inc. was made from Lucsok Target Account #1 on or around February 13, 2021, and thereby was necessarily comprised entirely of SUA proceeds and commingled funds.  As discussed earlier, LUCSOK would have been aware that Lucsok

44

Target Account #1 would have contained proceeds of unlawful activity, and knowing this, she engaged in a financial transaction involving over $10,000 for purchase of Lucsok Target Vehicle #1 and thereby violated 18 U.S.C. § 1957.  The vehicle is therefore subject to forfeiture in its entirety as the subject of the money laundering transaction.

107.    Net of fees and trade-in value, the remaining amount of $43,486.38 was financed with Porsche Financial Services.  The following payments were made from Lucsok Target Account #1 to Porsche Financial Services, and thereby these payments were necessarily comprised of SUA proceeds and commingled funds, as Lucsok Target Account #1 was regularly being fed SUA proceeds, and these payments would therefore have contained some quanta of such SUA funds and commingled funds.  The payments were as follows:

| Posted Date | Amount |
| --- | --- |
| 4/23/2021 | $(705.58) |
| 4/30/2021 | $(690.58) |
| 6/1/2021 | $(690.58) |
| 6/30/2021 | $(690.58) |
| 7/30/2021 | $(690.58) |
| 9/2/2021 | $(690.58) |
| 9/30/2021 | $(690.58) |
| 11/1/2021 | $(690.58) |
| 11/30/2021 | $(690.58) |
| 12/30/2021 | $(690.58) |
| 1/31/2022 | $(690.58) |
| 2/28/2022 | $(690.58) |
| 3/30/2022 | $(690.58) |
| 5/2/2022 | $(690.58) |
| 5/31/2022 | $(690.58) |
| 6/30/2022 | $(690.58) |
| 8/1/2022 | $(690.58) |
| 8/30/2022 | $(690.58) |

| | |
|---|---|
| 9/30/2022 | $(690.58) |
| 10/31/2022 | $(690.58) |
| 11/30/2022 | $(690.58) |
| 12/30/2022 | $(690.58) |
| 1/30/2023 | $(690.58) |
| 2/28/2023 | $(690.58) |
| 3/30/2023 | $(690.58) |
| 5/1/2023 | $(690.58) |
| 5/30/2023 | $(690.58) |
| 6/30/2023 | $(690.58) |
| 7/31/2023 | $(690.58) |
| 8/30/2023 | $(690.58) |
| 10/2/2023 | $(690.58) |
| 10/30/2023 | $(690.58) |
| 11/30/2023 | $(690.58) |
| 1/2/2024 | $(690.58) |
| 1/30/2024 | $(690.58) |
| 2/29/2024 | $(690.58) |
| 4/1/2024 | $(690.58) |
| 4/30/2024 | $(690.58) |
| 5/30/2024 | $(690.58) |
| 7/1/2024 | $(690.58) |
| 7/30/2024 | $(690.58) |
| 8/12/2024 | $(20,239.42) |
| | **$(48,568.20)** |

108.    These loan payments were made using SUA proceeds and commingled funds from Lucsok Target Account #1.  Based on LUCSOK's involvement in the fraud and conspiracy, it is likely that she knew that account funds were proceeds of illegal activity.  The movement of the SUA funds to obtain the car (via loan payments) would have concealed the nature and source of the SUA funds.  Accordingly, there is probable cause to believe that these transactions constituted concealment money laundering.  As such the entire vehicle, as the subject of the money laundering transactions, is subject to forfeiture.

46

*Lucsok Target Vehicle #2*

109.    Lucsok Target Vehicle #2 was purchased in September 2023 from Tynan's Volkswagen Inc. with a total sales price including fees of $28,903.74.  Check #156 from Lucsok Target Account #1 for $28,903.74 was made payable to Tynan's Volkswagen Inc. for the purchase of Lucsok Target Vehicle #2.  Accordingly, this vehicle was purchased using funds that necessarily included laundered SUA proceeds, along with commingled funds, and, as previously discussed, there is probable cause to believe that LUCSOK knew that these funds were proceeds of unlawful activity.  Use of the funds to purchase a car would have concealed the nature and source of the funds.  Accordingly, there is probable cause to believe that the check payment constituted concealment money laundering, as well as § 1957 money laundering.  As the subject of the laundering, under either theory, the vehicle is subject to forfeiture.

110.    A review of Lucsok Target Account #1 reveals monthly payments to Nationstar Mortgage DBA Mr. Cooper totaling $74,423.38 from September 2024 to November 2025, detailed below:

| Posted Date | Amount |
|---|---|
| 9/3/2024 | $(5,047.36) |
| 10/3/2024 | $(5,047.36) |
| 11/4/2024 | $(5,047.36) |
| 12/3/2024 | $(5,047.36) |
| 1/3/2025 | $(5,047.36) |
| 2/3/2025 | $(5,047.36) |
| 3/3/2025 | $(5,047.36) |
| 4/3/2025 | $(5,047.36) |
| 5/5/2025 | $(4,863.50) |

| | |
|---|---|
| 6/3/2025 | $(4,863.50) |
| 7/3/2025 | $(4,863.50) |
| 8/4/2025 | $(4,863.50) |
| 9/3/2025 | $(4,863.50) |
| 10/3/2025 | $(4,863.50) |
| 11/3/2025 | $(4,863.50) |
| | **$(74,423.38)** |

111.    Therefore, payments from Lucsok Target Account #1 to mortgages affiliated with Lucsok Target Property #1 totaled $201,015.92 from June 2022 to November 2025.

112.    Funds from Lucsok Target Account #1, were used to make loan payments on Lucsok Target Property #1, and as such those payments would necessarily have included SUA proceeds and commingled funds from Lucsok Target Account #1.  It is likely that LUCSOK knew that the payment funds included proceeds of unlawful activity.  The movement of the SUA funds to make loan payments on the residence would have concealed the nature and source of the SUA funds.  Accordingly, there is probable cause to believe that these transactions constituted concealment money laundering.  Furthermore, the residence, as the subject of the money laundering transactions, is subject to forfeiture.

*Forfeitability of Sandgaard Targets Accounts ## 3 and 5*

113.    A review of Sandgaard Target Account #1 reveals total deposits of $51,306,042.48 from January 2019 through October 2025.  The largest deposits to Sandgaard Target Account #1 are listed below:

| | |
|---|---|
| Wells Fargo Bank | $19,274,800.00 |
| Royal Bank of Canada ("RBC") ending in 1143 | $12,136,966.00 |

| | |
|---|---|
| BoA 4546 | $9,264,738.37 |
| RBC ending in 7651 | $3,100,000.00 |
| Doma Insurance Agency Inc. | $1,368,545.12 |
| Raelynn Maloney | $1,200,000.00 |
| RBC ending in 8995 | $1,630,000.00 |
| First American Title Insurance | $578,788.16 |
| RBC ending in 8351 | $360,000.00 |

114.    A review of Sandgaard Target Account #1 reveals total withdrawals of $51,301,596.51 from January 2019 through October 2025.  The largest withdrawals from Sandgaard Target Account #1 are listed below:

| | |
|---|---|
| Transfers to Sandgaard Target Account #2 | $25,546,100.00 |
| Freshfields Bruckhaus Deringer (Freshfields LLP)(UK law firm) | $15,275,366.30 |
| Bank of America Account ending 8162 | $856,397.48 |
| Internal Revenue Service | $1,200,000.00 |
| Bank of America Account ending 1369 | $415,931.93 |
| Bank of America Account ending 0849 | $385,795.00 |
| Danbolig (Danish real estate agency) | $374,518.63 |
| Estate Andersen & Thomsen (Danish real estate agency) | $365,076.25 |
| RBC ending in 1143 | $350,000.00 |
| *Transfers to Sandgaard Target Account #3* | $327,015.00 |
| *Transfers to Sandgaard Target Account #4* | $308,000.00 |
| Bank of America Account ending 3891 | $147,920.00 |

Furthermore, during the period February 2025 through December 2025, Sandgaard Target Account #1 transferred the following funds to the specified target accounts:

| | |
|---|---|
| *Sandgaard Target Account #3* | $36,700.00 |
| *Sandgaard Target Account #4* | $98,000.00 |

115.    As described earlier, there is probable cause to believe that Sandgaard Target Account #1 contained SUA proceeds and accumulated them regularly on a

month-by-month basis from 2019 through 2025, that the contents of the account were SUA proceeds with commingled funds, and that SANDGAARD was aware that the account contained proceeds of unlawful activity.  The movement of funds from Sandgaard Target Account #1 to Sandgaard Target Accounts ## 3 and 4 would necessarily have involved the transfer of SUA proceeds, and each of these accounts received SUA proceeds from Sandgaard Target #1 within the last year.  Furthermore, this movement of SUA proceeds has the natural effect of concealing the nature and source of the SUA proceeds.  Accordingly, there is probable cause to believe that these transfers to these accounts constituted money laundering, and that the contents of these accounts are subject to forfeiture in their entirety because all content funds are SUA proceeds or commingled funds and the accounts each facilitated money laundering.

### *Forfeitability of Sandgaard Target Vehicle #1*

116.    Sandgaard Target Vehicle #1 was purchased from Sonic Advantage PA, LLC, 11850 Katy Freeway, Houston, TX 77079, in August 2023 with a sales price of $86,807.08.  A wire transfer payment of $93,127.01 was made from Sandgaard Target Account #2 on or around August 15, 2023.  Based on the regularity of Sandgaard Target Account #2 receiving SUA proceeds from BoA 4546, with commingled funds, the analysis indicates that the wire transfer payment necessarily included SUA proceeds.  Based on SANDGAARD's involvement in the fraud and conspiracy, it is likely that he was aware that his wire transfer from Sandgaard Target Account #2 included proceeds of unlawful activity.  The movement of SUA proceeds from the account to payment for a vehicle has the natural effect of concealing the nature and source of the SUA proceeds.

50

Accordingly, this wire payment constitutes concealment money laundering. Furthermore, the wire payment was in excess of $10,000, and accordingly the payment constitutes money laundering in violation of 18 U.S.C. § 1957. Because the vehicle was the subject of the money laundering and facilitated the money laundering, it is subject to forfeiture.

*Forfeitability of Sandgaard Target Vehicle #2*

117. Sandgaard Target Vehicle #2 was purchased from Braman Motorcars, 2060 Okeechobee Boulevard, West Palm Beach, FL 33409 in November 2023. The precise sales price is unknown but was likely in excess of $95,000, because a wire transfer payment from Sandgaard Target Account #2 was issued to Braman Motorcars on or around November 15, 2023 in the amount of $95,662.00. Based on the regularity of Sandgaard Target Account #2 receiving SUA proceeds from BoA 4546, with commingled funds, the analysis indicates that the wire transfer payment necessarily included SUA proceeds. Based on SANDGAARD's involvement in the fraud and conspiracy, it is likely that he was aware that his wire transfer from Sandgaard Target Account #2 included proceeds of unlawful activity. The movement of SUA proceeds from the account to payment for a vehicle has the natural effect of concealing the nature and source of the SUA proceeds. Accordingly, this wire payment constitutes concealment money laundering. Furthermore, the wire payment was in excess of $10,000, and accordingly the payment constitutes money laundering in violation of 18 U.S.C. § 1957. Because the vehicle was the subject of the money laundering and facilitated the money laundering, it is subject to forfeiture.

51

*Forfeitability of Sandgaard Target Vehicle #3*

118.    Sandgaard Target Vehicle #3 was purchased from Schomp BMW (previously known as Arapahoe Motors Inc.), 1190 Plum Valley Lane, Highlands Ranch, CO 80129, in July 2023 with a sales price of $37,957.00.  A wire transfer payment of $39,484.00 was made from Sandgaard Target Account #2 on or around July 17, 2023. Based on the regularity of Sandgaard Target Account #2 receiving SUA proceeds from BoA 4546, with commingled funds, the analysis indicates that the wire transfer payment necessarily included SUA proceeds.  Based on SANDGAARD's involvement in the fraud and conspiracy, it is likely that he was aware that his wire transfer from Sandgaard Target Account #2 included proceeds of unlawful activity.  The movement of SUA proceeds from the account to payment for a vehicle has the natural effect of concealing the nature and source of the SUA proceeds.  Accordingly, this wire payment constitutes concealment money laundering.  Furthermore, the wire payment was in excess of $10,000, and accordingly the payment constitutes money laundering in violation of 18 U.S.C. § 1957.  Because the vehicle was the subject of the money laundering and facilitated the money laundering, it is subject to forfeiture.

## CONCLUSION

119.    Based on the above, I believe that there is probable cause to support in rem civil forfeiture actions against Lucsok Target Accounts ## 1, 2, 3, 4, 5, and 6; Lucsok Target Vehicles ## 1 and 2; Sandgaard Target Account ## 1, 2, 3, and 4; Sandgaard Target Vehicles ## 1, 2, and 3; as they are each subject to forfeiture.

Respectfully submitted,

*Amy Mousseau*

Special Agent Amy Mousseau
Defense Criminal Investigative
Service ("DCIS")